1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

9

# SOUTHERN DISTRICT OF CALIFORNIA

10

11

SLPR, LLC, et al.,

CASE NO. 06 CV 1327 MMA (POR)

12

Plaintiffs,

**ORDER GRANTING DEFENDANT NAVY'S RENEWED AMENDED MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT ON FOURTH CAUSE OF ACTION**

13

vs.

14

15

UNITED STATES ARMY CORPS OF ENGINEERS, and UNITED STATES NAVY,

16

[Doc. Nos. 251, 287]

17

Defendants.

18

19        Now before the Court are cross motions for summary judgment on the fourth cause

20   of action.  For the reasons stated below, the Court **GRANTS** Defendant Navy's renewed

21   amended motion for summary judgment and **DENIES** Plaintiffs' cross-motion for

22   summary judgment on the fourth cause of action.

23   **I.      BACKGROUND**

24        Plaintiffs SLPR, LLC, the Sewall Family Trust, and the Goodfellow Family Trust

25   (hereinafter "Plaintiffs") own homes on the bayside of First Street in Coronado, which is

26   adjacent to the Naval Air Station North Island (hereinafter "North Island" or "NASNI").

27   Plaintiffs' fourth cause of action contends that the Defendant Navy violated the

28   Administrative Procedures Act ("APA") by dredging San Diego Bay in a manner that

caused or exacerbated erosion along their shoreline properties.  Third Am. Compl. ("TAC") ¶¶ 94-101.[1]  The Navy has homeported three aircraft carriers on North Island since World War II.  At the outset, the aircraft carriers were conventionally powered.  Various dredging operations were performed over the years, but these motions concern the Navy's dredging activities in 1997/1998 and in 2002.  *See* Pls.' Ex. EE & Fig. 6-1(USA-006045); Def.'s Ex. 17 (USA-063511 to 063541).  Those projects were necessary when the Navy replaced the older carriers with the much larger nuclear-powered aircraft carriers.

<u>1995 Environmental Impact Statement ("1995 EIS")</u>

When Congress decided in 1993 to close several military bases and relocate functions to existing bases, the Navy made plans to homeport NIMITZ-class nuclear aircraft carriers on North Island.  The Navy recognized that several NIMITZ carriers might be homeported in San Diego in the future, but the 1995 EIS evaluated the impact of one permanent carrier (and one visiting).  Def.'s Ex. F at 1-2 to 1-4 (USA-005509 to 005511).

The Bay was then -42 MLLW deep.[2]  The deep draft of the NIMITZ carriers required dredging to provide a 50-foot water depth at the berths and in the Turning Basin, but -55 MLLW in the main Navigation Channel.  *Id.*; Binder 8 (USA-005511, 005558, & Fig. 2-7).[3]  The Navy anticipated it would dredge over 9 million cubic yards of material.  Binder 8 (USA-005542 & 005545).

_____

[1]Initially, Plaintiffs' first, second, and third claims for relief, were alleged against the San Diego Unified Port District.  This Court severed and remanded those claims to State Court, where Plaintiffs were suing the State of California.  The TAC also omitted the claims made by other Plaintiffs – Dickerson and Gunning – because they settled their claims before the TAC was filed.  [# 97]

The fifth and sixth causes of action are against the Army Corps of Engineers ("ACOE" or "Corps").  The Court held in Plaintiffs' favor on the fifth claim, and remanded the matter to the ACPE for further proceedings.  Order Granting Pls.' and Denying Defs.' Mot. for Summ. J. on Fifth Claim [# 161 (filed Aug. 4, 2009) (hereinafter "Order on the Fifth Claim")].  The Court resolved the sixth claim, concerning an emergency permit, in favor of Defendant ACOE.  [# 332]

[2]Depth is measured by feet below Mean Lower Low Water ("MLLW").  "Bathymetry" is the measurement of the depth of water in oceans.

[3]The Navy lodged the entire Administrative Record in 34 binders.  In those instances when the parties did not attach an exhibit, the Court has cited the binder number with the USA-page number.

The Navy studied the potential environmental impact of dredging San Diego Bay in order to homeport these deep-draft carriers.  The EIS specifically identified the issue of "potential erosional damage to existing properties on First Street as a result of dredging." *Id.* (USA-005530).

The Navy concluded that the shoreline was "not expected to be affected by the deepening of the turning basin" because it was protected by the Navy's quaywall.  Def.'s Ex. F at 4.1-7 (USA-005795).  "The shoreline east of the turning basin along First Street is not expected to be affected" for two reasons.  First, "[t]he dredging of the turning basin will not extend beyond the eastern end of the existing quaywall."  *Id.*.  Second, the "relatively shallow dredging" is "not expected to change the existing patterns of currents and other hydrodynamic conditions," therefore, "the stability of sediments along the shoreline east of the turning basis is not expected to be affected."  *Id.*

The Navy used a "two-dimensional hydrodynamic computer model" to investigate the "potential impact of dredging on bay circulation."  *Id.* at 4.1-34 (USA-005821).  The model predicted "changes in the water current speed and sediment transport rates between existing bathymetric conditions" and those that "would exist after" dredging.  *Id.*  The model concluded that both current speeds and sediment transport would be *reduced*.  *Id.* at 4.1-35 (USA-005822).

The Navy designed and implemented mitigation measures on shallow water habitats "to avoid erosion from tidal processes, wave characteristics, and storm upwellings."  *Id.* at 4.4-1 (USA-005965).  By contrast, the Navy did *not* anticipate erosion due to dredging; consequently, the Navy determined that no other mitigation measures were necessary.  *Id.*

On December 13, 1995, the Navy issued its Record of Decision.  Def.'s Ex. H (USA-012131 to 012138).

Pursuant to the Coastal Zone Management Act ("CZMA"), the Navy submitted its consistency determination to the California Coastal Commission, and that state agency concurred.  Def.'s Exs. A & B.

The Navy began this dredging project in August 1997 and completed it in 1998.

1   / / /

2

3        1999 Environmental Impact Statement ("1999 EIS")

4        As had been anticipated, NASNI soon became the homeport for additional nuclear

5   carriers.  The 1999 EIS studied the impact of homeporting two additional nuclear carriers,

6   for a total of three in San Diego.  Def.'s Exs. L § 2.3.3.1 (USA-014147 to 014151), O

7   (USA-019426); *see* Pls.' Ex. DD at 2 (USA-063652).  The two new deep-draft carriers

8   would be replacing two conventionally-powered carriers, thus much of the work related to

9   construction at the berthing facilities.

10       The 1999 EIS analyzed the potential environmental impacts including dredging, and

11  found "significant but mitigable impacts on marine biological resources" (such as eelgrass

12  and birds); however, "[a]ll other environmental impacts . . . would be less than significant."

13  Def.'s Ex. L (Abstract at USA-219) (USA-014077).

14       The Navy planned to dredge 8 additional feet to a -50 feet MLLW in one berthing

15  area, which amounted to approximately 582,500 cubic yards of material.[4]  *Id.* (§ 2.3.3.1 at

16  USA-235) (USA-014147); *see* Pls.' Ex. O (USA-045741 to 045745) (discussing changes at

17  existing pier).  This 18-acre area is located on the north end of Coronado Island at existing

18  Pier J/K.  No further dredging was required to alter the berth along the quaywall (or the

19  Turning Basin and Navigation Channel) because that area already accommodated a visiting

20  nuclear carrier (and the first homeported nuclear vessel).  Pls.' Ex. O (USA-045745)

21  (discussing berth L); Def.'s Ex. 34 (USA-04936).

22       The Navy concluded that the environmental impact of dredging on topography,

23  geology, soils, terrestrial hydrology, water quality, sediment quality, and many other

24  resources was "not significant."  Pls.' Ex. O (Alternative 2 in Table 2-11) (USA-045776 to

25  _____

26       [4]Plaintiffs alleged that portions of the Turning Basin were dredged in 2002.  Pls.'
Controverting Statement of Facts ¶ 21.  The Navy states the dredging was restricted to Berth
J at Pier J/K, and the Court's review of the record confirms that fact.

27       The Navy also argues that the geographic location of the berthing area that was dredged
in 2002 is not relevant to Plaintiffs' claims.  The Navy offers no support for this bare

28  conclusion.  Plaintiffs contend that the cumulative effects potentially affect their property and
that the additional carriers would create ship wakes.

045781).  As Plaintiffs observe, the 1999 EIS considered, very briefly, the impact of dredging on shoreline erosion.  *See* Pls.' Exs. O & Y; *see* Binder 24 (USA-014201 to 14203) (impact on topography and geological environment includes erosion process, and discussing "depositional disruptions").  The Navy concluded that the additional dredging, which "would primarily occur within previously dredged areas," would impact only "the immediate vicinity" and "would be less than significant."  Pls.' Ex. AA (USA-045991 to 045992); Binder 24 (USA-014202 to 014207) (concluding "impacts on geological resources due to dredging are less than significant" because dredging would be done in area of previous dredging).

Because the impact of the proposed dredging was "less than significant," the Navy was *not* required to propose mitigation measures (such as erosion barriers).

The Navy issued its Record of Decision on January 30, 1999.  Def.'s Ex. 35; 74 Fed. Reg. 6140.

The Navy provided its consistency determination to the California Coastal Commission, and the agency concurred.  Def.'s Exs. K (USA-013367) & I (USA-012355).

 In July 2000, the Navy received permission from the ACOE to "dredge an estimated 582,500 cubic yards of material from an existing depth of -42 MLLW to a desired depth of -50 feet MLLW over an approximate 18 acre site."  Pls.' Ex. P (USA-019536); *id.* at 7 (USA-019542) ("No dredging is authorized in any other location under this permit.").

The dredging was conducted in 2002.

2008 Supplemental Environmental Impact Statement ("2008 SEIS")

In October 2007, the Navy announced it would supplement the 1999 EIS "to analyze the effectiveness of the existing traffic mitigation measure" when all three carriers were simultaneously at North Island.  72 Fed. Reg. 59084 (Oct. 18, 2007); Pls.' Ex. DD at 3 (USA-063653).  While the initial focus of the 2008 SEIS was traffic, another primary concern was shoreline erosion along First Street.  Def.'s Ex. P at ES-2 (USA-280).  Plaintiffs and others submitted comments about erosion due to dredging and wakes from ships, and the Navy responded by comparing current and past erosion conditions.  *Id.* at §

1.8.1 (USA-282 to 283); *id.* at 2.6.3 (USA-286); *see also* Def.'s Ex. 21 (Congresswoman Susan Davis encouraged the Navy to consider whether dredging the Turning Basin to accommodate aircraft carriers contributed to shoreline erosion along First Street).

Chapter 5 of the 2008 SEIS contains the Navy's analysis of the Plaintiffs' concerns. Def.'s Ex. Q. The Navy concluded that the erosion "along First Street is a result of natural conditions and historical alterations to the bay." *Id.* § 5.5 (USA-300).

Specifically, the Navy evaluated the Coronado Shoreline Report.[5] Def.'s Ex. Q § 5.3. The Navy discounted the weight because the ACOE relied on aerial photography and its abbreviated analysis was "not to be taken as comprehensive." Def.'s Ex. Q § 5.3 (USA-299). "Rather, the report[ was] conducted as superficial appraisals of the shoreline for the purpose of determining Federal Interest in shoreline protection and equally as important, recreational land improvements. The breadth of research and depth of analysis was understandably well below USACE standards for technical analysis because [it was] not intended as such." *Id.*

Instead, the Navy considered the "sediment budget" a more important factor. The diversion of the San Diego River between 1876 and 1937 accounted for the direct loss of sediment to the Coronado shoreline. *Id.* (USA-298). The Navy concluded that the "effects of these alterations were masked along First Street because between 1929 and 1985, artificial fill was placed along the shoreline in quantities and frequencies sufficient to 'grow' the shoreline bayward by as much as 90 feet." *Id.* (USA-299). The Navy concluded that when the Coronado Shoreline Report stated that 1.7 feet of shoreline was

---

[5]In its Order on the Fifth Claim, the Court relied upon the Coronado Shoreline Initial Appraisal Report by the ACOE, and referred to it as "the Coronado Shoreline Report," in the singular. [# 161] Here, the Navy refers to reports, plural, to include that Initial draft (dated December 2000) and the subsequent "Reconnaissance Study to the Coronado Shoreline Report" (dated 2005). The ACOE evaluated the impact of the dredging activities on the Coronado shoreline in relation to waves created by ships. The ACOE concluded that ship wakes were causing shoreline erosion of 1.7 feet per year, and predicted that the foundations of the homes on First Street would be in jeopardy in approximately 10 years. The ACOE stated that the steep drop-off close to shore contributed to erosion. Both versions reached the same conclusion that the extensive ship traffic is causing erosion of the homes along First Street. For consistency, the Court continues to describe the single "Coronado Shoreline Report," as it is not necessary to distinguish between the two versions.

eroding each year, it referred to the *artificial* shoreline that had been created.  *Id.* (USA-299 to 300); Def.'s Ex. R (color maps and illustrations).

Though the Navy did not study "the general erosive effects of boat wakes," it acknowledged that boat wakes contribute to erosion in the same manner as "natural wave action."  Def.'s Ex. Q at § 5.4 (USA-299).  The Navy found that its aircraft carriers were "responsible for only 0.02 percent of total annual ship, boat, and vessel movements in San Diego  Bay."  *Id.*  Moreover, the large carriers moved slowly, and the speed of the vessel determines the size of the wake.  *Id.*  "Aircraft carrier movements; therefore, are not a substantial source of boat-generated waves in San Diego Bay."  *Id.*

In particular, the Navy could not operate the NIMITZ carriers in the area South of the Turning Basin, which is across from the First Street homes.  Instead, the Navy used tug-boats to turn the deep-draft carriers into their docks.  *Id.* (USA-300).  "In normal conditions, tug movements do not stir up sediment or create substantial wakes."  *Id.*

The Navy bolstered its conclusion by citing the 2008 SPAWAR study of currents in the area South of the Turning Basin.  *Id.*; Def.'s Ex. S.  Pei-Fang Wang and Ken Ricther prepared the SPAWAR study, entitled "Altered Tidal Flow Field in San Diego Bay, South of North Island, as a Result of Dredging in the North Island Turning Basin," for the specific purpose of examining the effects of the Navy's dredging activity.  Def.'s Ex. S (USA-333). This technical report measured the speed and direction of the current at various depths and in various tidal conditions.  Sediment samples were taken to conservatively "estimate transport potential of the nearshore currents."  *Id.* (USA-343).  The study compared its data with that collected before the Turning Basin was dredged to -50 MLLW. and concluded that "post-dredge currents are not faster than pre-dredge currents taken in the vicinity."  *Id.* (USA-345).  "A modeling study confirmed the observation that deepening the turning basis would not result in higher current speeds" along First Street.  *Id.* (USA-352)  The Navy relied on the study to conclude that "the First Street area is not appreciably affected by dredging."  Def.'s Ex. Q § 5.5 (USA-300).

The Navy also based its conclusion on the presence and population of eelgrass along

1    First Street.  *Id.*

2         The Navy published its Record of Decision on January 30, 2009.

## II.    **STATUTE OF LIMITATIONS**

4         The Navy argues that Plaintiffs' fourth claim is barred by the six year statute of

5    limitations.  28 U.S.C. § 2401(a); *Wind River Mining Corp. v. United States*, 946 F.2d 710,

6    712-13 (9th Cir. 1991); *Sierra Club v. Penfold*, 857 F.2d 1307, 1315 (9th Cir. 1988).  The

7    Navy argues the limitations period began to run on the 1995 EIS on December 13, 1995

8    when the Navy published its Record of Decision in the Federal Register.  *Wind River*, 946

9    F.2d at 713-16;  *Pub. Citizen v. Nuclear Regulatory Comm'n*, 901 F.2d 147, 153 (D.C. Cir.

10   1990).  Similarly, the clock started on the 1999 EIS when the Navy issued its Record of

11   Decision in January 1999.  Yet Plaintiffs sued the Federal Defendants more than six years

12   later.[6]

13        The Navy ignores the Plaintiffs' valid argument that the limitations period was

14   reopened when the Navy reviewed and reiterated its prior decision in the 2008 SEIS

15   proceedings.  Courts have consistently held that the statute of limitations does not bar

16   review of agency actions that reopen a previously decided issue when the agency reaches

17   the same decision at a subsequent proceeding.  *Bluewater Network v. EPA*, 370 F.3d 1, 16-

18   17 (D.C. Cir. 2004); *Edison Elec. Inst. v. EPA*, 996 F.2d 326, 332 (D.C. Cir. 1993); *Pub.*

19   *Citizen*, 901 F.2d at 150; *Manitoba v. Salazar*, 691 F. Supp. 2d 37, 49 (D.D.C. 2010).

20   Agency reconsideration may be either explicit or implicit.  *Pub. Citizen*, 901 F.2d at 150.

21   The agency's stated purpose is not determinative because the court may infer from the

22   entire record that the agency implicitly reopened a previously decided issue.  *Bluewater*

23   _____

24        [6]The Navy emphasizes that it was not named as a defendant until December 2007 when
     Plaintiffs filed a Second Amended Complaint. [#44] However, the Plaintiffs alleged the same

25   fact pattern – dredging in the Bay to accommodate the Navy's aircraft carriers caused erosion
     at their homes – in their original complaint.  That complaint was filed against the Port District

26   in Superior Court in February 2006.  It expressly alleged that the ACOE conducted and
     implemented the dredging projects in conjunction with the Port District.  On the Port District's

27   motion to add a necessary party, Plaintiffs added the ACOE as a defendant in May 2006.
     Under Rule 15(c), Plaintiffs benefit from the relation-back doctrine and thus the claims against

28   the Navy relate back to May 2006.  *Cf. Sierra Club*, 857 F.2d at 1315-16.  Nonetheless, the
     May 2006 filing was not within the six year period.

*Network*, 370 F.3d at 16 (whether the agency reopened an issue depends on the entire context, including the agency's reactions and proposals, and "not just the agency's stated intent") (internal quotations and citations omitted); *Pub. Citizen*, 901 F.2d at 151-52 (when agency's action "necessarily raises" the lawfulness of an earlier action, review of the earlier action is not time barred) (citation and quotation omitted). Courts examine whether the agency proposed a change; whether the agency called for comments on the issue; whether the agency explained the unchanged portions of its decision; and whether the agency responded to a comment aimed at the previously decided issue. *Pub. Citizen*, 901 F.2d at 150. If the agency explicitly or implicitly reconsiders an issue, the time period to challenge it "would start afresh." *Id.*

Plaintiffs' challenge to the 2008 SEIS is timely. A central purpose of the 2008 SEIS was to address the Plaintiffs' concerns that dredging was causing erosion under their homes. Plaintiffs correctly observe that the 2008 EIS expressly and explicitly reopened the First Street erosion issue from the 1999 EIS. Pls.' Ex. 0 (Executive Summary of 2008 SEIS states "the purpose of this document is to supplement the impact analyses contained in the 1999 FEIS"); Def.'s Ex. 34 at 3 (Record of Decision states 2008 SEIS "was prepared for the limited purpose of supplementing the 1999 FEIS and the 2000 ROD with current circumstances and information" including "shoreline erosion along First Street in the City of Coronado, California."). The Navy undertook the 2008 review process "in response to Plaintiffs' allegations in this lawsuit," and re-examined whether the dredging of its turning basin caused shoreline erosion along First Street. Def.'s Opening Br. at 2. The Navy solicited comments from the homeowners, responded to their comments, and then reached the same decision that the dredging was not causing erosion along First Street. Def.'s Ex. 34 at 3 ("The 2008 Final SEIS does not propose any changes to the Proposed Action analyzed in the 1999 FEIS."); *Edison Elec.*, 996 F.2d at 332 (agency reopened issue by soliciting comments and proposing reconsideration). The Navy put its earlier analysis "in play" by offering new studies and explanations for its prior finding. *Bluewater Network*, 370 F.3d at 17. Thus, Plaintiffs attack on the underlying findings in the 1999 EIS of the

1   impact of dredging on shoreline erosion is not barred by the statute of limitations. *Id.* at

2   16-17.

3        While the Navy explicitly reconsidered the 1999 EIS, the Court finds that it

4   implicitly reopened the shoreline erosion issue in the 1995 EIS. The entire context of the

5   Navy's 2008 SEIS proceedings shows that it explicitly reconsidered its analysis of the

6   erosion problem and responded to Plaintiffs' comments on the subject. *Edison Elec.*, 996

7   F.2d at 332; *Pub. Citizen*, 901 F.2d at 150-51. Whereas the 1999 EIS only briefly and

8   generally discussed erosion, the 1995 EIS identified the issue of erosion on First Street

9   where Plaintiffs own homes. Binder 8 (USA-005530). The 1999 EIS and the 2008 EIS

10  both rely extensively on documents prepared for the 1995 EIS. *Manitoba*, 691 F. Supp. 2d

11  at 49 ("court may examine prior agency action on which the validity of the later agency

12  action under review depends") (internal quotations and citations omitted). Moreover, when

13  the Navy prepared the 1995 EIS it knew that additional nuclear aircraft carriers would be

14  stationed at North Island in the future, thereby anticipating that the subject would arise

15  again. It did. A few short months after the extensive dredging operation to accommodate

16  the first carrier, the Navy revisited the same issues to homeport more nuclear carriers.

17  Finally, the 1995 EIS authorized the largest of the two dredging projects at issue, that is,

18  the dredging of the Turning Basin and central Navigation Channel to remove over 9 million

19  cubic yards of material. *See* Pls.' Ex. EE (USA-006049) (Table 6-2). The Navy could not

20  study the effect of dredging on Plaintiffs' property in the 2008 SIES without considering

21  that massive project. *Pub. Citizen*, 901 F.2d 151-52. The Navy substantively reexamined

22  and then reaffirmed its original decision, thus, it is not too late to challenge the findings

23  upon which its actions depend.[7] *Manitoba*, 691 F. Supp. 2d at 49.

24

_____

25  [7]It appears that the Federal Defendants never answered the TAC. The response was due sixty days after Plaintiffs filed the TAC on April 15, 2007. [# 211 & 217] In the Federal

26  Defendants' answer to the Second Amended Complaint, they alleged that the statute of limitations barred the claim relating to the 1995 EIS. Am. Answer at p. 17 ¶ 6 [# 62] The

27  Navy did not plead the affirmative defense of statute of limitations as to the 1999 EIS; however, they may raise it now because the delay has not prejudiced the Plaintiffs. Fed. R.

28  Civ. Pro. 8(c)(1); *Magana v. Commw. of the N. Mar. I.*, 107 F.3d 1436, 1446 (9th Cir. 1997).
        In any event, even if the Navy had a viable statute of limitations defense, the Court

1    Accordingly, the Court rejects the statute of limitations defense.

2    / / /

3

4    **III.    ADMINISTRATIVE PROCEDURE ACT**

5        **A.    Standard of Review**[8]

6        Under the APA, the Court determines whether the agency action is "arbitrary,

7    capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. §

8    706(2)(A); *City of Sausalito v. O'Neill*, 386 F.3d 1186, 1205-06 (9th Cir. 2004); *e.g.*,

9    *Village of False Pass v. Clark*, 733 F.2d 605, 609 (9th Cir. 1984).

10       To fulfill its obligations, the Court must conduct a "thorough, probing, in-depth

11   review" of the administrative record.  *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401

12   U.S. 402, 415 (1971), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99

13   (1977).  "Although this inquiry into the facts is to be searching and careful, the ultimate

14   standard of review is a narrow one.  The Court is not empowered to substitute its judgment

15   for that of the agency."  *Id.* at 416; *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 744

16   (1985) (the "factfinding capacity of the district court" is unnecessary because court must

17   "decide, on the basis of the record the agency provides, whether the action passes muster

18   under the appropriate APA standard of review").

19       The agency's "decision is entitled to a presumption of regularity."  *Overton Park*,

20   401 U.S. at 415; *Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv.*, 378 F.3d 1059,

21   1071-72 (9th Cir. 2004) (presumption may be rebutted by evidence in the record).

22       The Court determines whether the agency "considered the relevant factors and

23   articulated a rational connection between the facts found and the choice made."  *Baltimore*

24   _____

25   would review those portions of the 1995 EIS and the 1999 EIS that were relied upon by the
     Navy in reaching its most recent conclusions in the 2008 SEIS.  *See* Def.'s Response at 1. [#
26   297]

27       [8]A motion for summary judgment is an appropriate vehicle to review an administrative
     action even though the Court does not use the standard of review in Federal Rule of Civil
28   Procedure 56.  *Friends of Endangered Species, Inc. v. Jantzen*, 589 F. Supp. 113, 118 (N.D.
     Cal. 1984); *accord Fund for Animals v. Babbitt*, 903 F. Supp. 96, 105 (D.D.C. 1995).

*Gas & Elec. Co. v. NRDC, Inc.*, 462 U.S. 87, 105 (1983).  The Court reviews whether the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983).

Courts should "defer to an agency's scientific or technical expertise."  *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 422 F.3d 782, 798 (9th Cir. 2005); *Nat'l Wildlife Fed'n v. U.S. ACOE*, 384 F.3d 1163, 1177-78 (9th Cir. 2004) (when technical question is complex and qualified scientists disagree, court must give "substantial deference" to agency's judgment) (citing *Baltimore Gas*, 462 U.S. at 103); *accord Lands Council v. McNair*, 537 F.3d 981, 988 (9th Cir. 2008) (en banc) (courts "do not act as a panel of scientists," instructing the agency on methodology, choosing among scientific studies, and ordering it "to explain every possible scientific uncertainty"), *overruled in part on other grounds by Winter v. NRDC, Inc.*, 555 U.S. 7 (2008), *as recognized by Am. Trucking Ass'ns v. Los Angeles*, 559 F. 3d 1046, 1052 (9th Cir. 2009).

When an agency has failed to explain its decision and judicial review is frustrated, the Court may request affidavits from the agency to explain the reasons for the action.  *Camp v. Pitts*, 411 U.S. 138, 142-43 (1973); *Pub. Power Council v. Johnson*, 674 F.2d 791, 793-94 (9th Cir. 1982).  If the agency's finding is not sustainable on the existing record, the Court remands to the agency for additional consideration, investigation, and explanation.  *Florida Power*, 470 U.S. at 744; *Camp*, 411 U.S. at 143; *Johnson*, 674 F.2d at 794.

## B. <u>Supplementing the Administrative Record</u>

"Judicial review of an agency decision typically focuses on the administrative record in existence at the time of the decision and does not encompass any part of the record that is made initially in the reviewing court."  *Southwest Ctr. for Biological Diversity v. U.S. Forest Serv.,* 100 F.3d 1443, 1450 (9th Cir. 1996) (citing *Camp*, 411 U.S. at 142).  The Ninth Circuit recognizes a few narrow exceptions to the general rule.  The Ninth Circuit

allows extra-record material "if necessary to determine whether the agency has considered all relevant factors and has explained its decision." *Id.* (quotations omitted); *Nat'l Audubon Soc'y v. U.S. Forest Serv.*, 46 F.3d 1437, 1447 (9th Cir. 1993) (district court may expand the Administrative Record when a plaintiff alleges the agency "neglected" or "failed to mention a serious environmental consequence."). The Court may rely on extra-record documents "when supplementing the record is necessary to explain technical terms or complex subject matter." *Southwest Ctr.*, 100 F.3d at 1450 (quotations omitted). Plaintiffs may also submit evidence beyond the administrative record when they allege the agency acted in bad faith. *Id.*

The Navy moves to strike the extra-record documents that Plaintiffs submitted, but Plaintiffs argue the documents fall within one of the recognized exceptions. (Plaintiffs do not object, and do not rely on Exhibit Z or the three pages at the start of Exhibit M.)

### 1. **Bad Faith**

As an initial matter, Plaintiffs argue that the Navy's 2008 study was "neither thorough nor balanced but rather was an after-the-fact attempt to excuse the Navy's prior decisions to dredge." Pls.' Mot. Br. at 2. Plaintiffs argue that the Navy instructed its project team to limit written communications to those that supported the foregone conclusion. They argue that the Navy "sanitized" the administrative record for the purpose of this litigation.

Plaintiffs quote language from an email from Peggy Harrell in July 2008 that raised concerns about "jumping the chain of command" that might derail the "very aggressive timeline" to complete the SEIS by January 2009 in time to homeport the USS Carl Vinson in April 2010. Pls.' Ex. B (USA-060105). Because three different staffs had been working on the project, which entailed "12 very complex EISs," Harrell said "we need everyone's cooperation to ensure that we are speaking with one voice." *Id.* Citing examples of communications that had not been properly routed through "USFF," Harrell requested cooperation to "ensure that all communications sent up the chain of command are *coordinated in advance and contain consistent strategic messages*, which are captured

accurately in the project administrative record." *Id.* (emphasis added).  Referring to one staff email that suggested "[m]aybe US FFC need a Bering Straights brief," Harrell noted that such "written communications are a part of the project administrative record and *will only serve to detract from the overall SEIS administrative record and create potential litigative risk with those who may wish to challenge our final decision.*" *Id.* (emphasis added); *see* Pls.' Ex. A (USA-054211) (March 2007 email states Navy can minimize risk of litigation "through prudent development of the document, appropriate public engagement and teamwork to ensure we follow the process properly.").

The Court does not read the cited passage as an indication of bad faith.  The context of the email shows that the main concern was to complete the environmental review on schedule to accommodate the arrival of the Vinson.  With that goal in mind, the informal message encouraged team members to follow the chain of command.  While the quoted statement shows that the Navy was aware that its actions could lead to litigation, it is not a "strong showing of bad faith or improper behavior." *Animal Def. Council v. Hodel*, 840 F.2d 1432, 1437 (9th Cir. 1988) ("Courts may inquire outside the agency record when plaintiffs make a showing of agency bad faith.").  The Navy was aware that it was a named Defendant in this lawsuit at the time it prepared the supplemental environmental report.

## 2.  Skelly Declaration, Expert Report, and Exhibits

Plaintiffs move to supplement the Administrative Record with a declaration and expert report by David W. Skelly.[9]  Skelly Decl. & Ex. B [# 287-4].

The Court concludes it is unnecessary to expand the record on the fourth cause of action because Skelly submitted very similar comments to the Navy during the

---

[9]Skelly is familiar with the administrative record, the environmental impact statements, and the technical issues involved in this litigation.  He is a civil engineer with 34 years of experience in coastal processes, including near shore waves, beach sediment transport, and the design and engineering of coastal structures.  Skelly Decl. ¶¶ 2-3.  Skelly has worked with Scripps Institution of Oceanography, the Navy, and the ACOE. *Id.* ¶ 2.

In the Order on the Fifth Claim, the Court referred to a report by Skelly to show the ACOE omitted an important factor and to explain technical terms.

supplemental environmental impact assessment.[10]  Def.'s Mot. to Strike, Ex. 2 (USA-061464 to 061471); Comment 16 (USA-050453 to 050465).  Skelly submitted his technical report as well as his own independent bathymetric survey of the First Street shoreline. Pls.' Ex. KK § 2.0 (NAVFAC-002461); *cf.* Skelly Decl. at 4-5 & Fig. 1-2.  The Navy responded to Skelly's comments and the Navy's analysis is part of the existing Administrative Record on the 2008 SEIS.  Pls.' Ex. KK (NAVFAC-002459 to 002466); Response 16 (USA-050453 to 050465).  Consequently, there is no need to supplement the administrative record with the duplicative information.  *Friends of the Payette v. Horseshoe Bend Hydroelec. Co.*, 988 F.2d 989, 997 (9th Cir. 1993) (excluding 13 experts' testimony when "much of it addressed concerns the same witnesses had already raised during the public comment period"); *Animal Def.*, 840 F.2d at 1437 (refusing to expand record when it contained "adequate information" responding to plaintiff's information).

### 3.  1955 Beach Erosion Control Report

Plaintiffs move to supplement the record with the Beach Erosion Control Report prepared by the ACOE in 1995.  Pls.' Ex. H (USA-062699) (hereinafter "1955 Report").  The ACOE surveyed erosion problems along the San Diego coastline, including the "Bayview Estates" residential development where Plaintiffs' homes are located.  It responded, in part, to residents' concerns that the dredging operation conducted in 1946 was so close to their homes that it was causing erosion.

The Court grants this motion because the 1995 Report is a part of the administrative record even though the agency did not include it in its lodgment.  "The 'whole' administrative record . . . consists of all documents and materials directly or *indirectly* considered by agency decision makers."  *Thompson v. U.S. Dep't of Labor*, 885 F.2d 551, 555 (9th Cir. 1989).  The Navy referred to the 1955 Report in its environmental impact

---

[10]The Court compared the Declaration with the Comments, and found that both contain the same criticisms. The Court has used the exhibits attached to the Declaration because the Navy neglected to include them in the Administrative Record.  *Compare* Skelly Decl. Fig. 1 & 2 *with* Def.'s Mot. to Strike, Exs. 1 & 2 (USA-061461 to 061471).  It was necessary to examine the exhibits to understand the substance of Skelly's analysis.

1   statement, and thus it is properly before the Court.[11]   Def.'s Ex. Q at § 5.3 n.4 (USA-298).

2   ### 4. Eelgrass Reports

3   The Navy moves to strike two reports about the coverage and density of eelgrass.

4   Pls.' Exs. K & L.

5   The Court denies this motion and finds that the reports are admissible for the

6   purpose of determining if the agency considered all relevant factors. *Southwest Ctr.*, 100

7   F.3d at 1450; *Nat'l Audubon*, 46 F.3d at 1447.  Exhibit K is a survey of eelgrass that was

8   prepared for the ACOE (the Navy's co-defendant) in connection with proposed future

9   project to dredge the central Navigation Channel.  Pls.' Ex. K (USA-22537 to 22550)

10  (dated August 27, 2004).  The report is reliable because it was commissioned by the

11  Federal Defendants to comply with the environmental permit requirements of a dredging

12  permit.  *Id.* (USA-22541).  It also builds on studies conducted by the Navy in 1993 and

13  1999.  *Id.* (USA-22541).  Exhibit L is a related report, prepared for the same purpose.  Pls.'

14  Ex. L (dated June 10, 2005) (USA-21846 to 21854).

15  ### 5. Rosenberry Declaration

16  Plaintiffs submitted a declaration from an environmental planner, Ann Rosenberry,

17  who formerly worked for the chief engineer on the NASNI dredging projects.  Rosenberry

18  Decl. ¶¶ 1-3, 6.  Rosenberry made this declaration *for the Federal Defendants'* motion to

19

20  [11]Indeed, the ACOE sought to introduce its 1955 Report in the summary judgment motion on the fifth cause of action [# 113], and the Court granted that request.  Order on the Fifth Claim at 10-11.

21  The Court rejects Plaintiffs' speculation that the government did not disclose the report to the affected homeowners. Pls.' Mot. Br. at 2.  Plaintiffs suggest the Navy acted in bad faith

22  to hide the report. *Id.* at 10.  The record does not support this assertion.  The 1955 Report itself states that it was prepared to respond *to the concerns of homeowners on First Street* that

23  dredging was causing erosion.  Pls.' Ex. H  at 12 (USA-062715) ("Local property owners desire a determination of the cause of erosion and the most economical means of stabilizing

24  the shoreline in this area.").  The Report ultimately recommended that the homeowners should build a concrete revetment to protect their private property.  *Id.* at 54 ¶ 146 (USA-062757).

25  Moreover, the Navy expressly evaluated the technical findings in the 1955 Report when it prepared the SEIS in 2008.  Pls.' Ex. X (USA-063550 to 063553); *see* Pls.' Ex. H (email

26  directs staff to discuss the 1955 report) (USA-062697).  The Navy found the 1995 Report had limited value given its age, but assessed the relevance of the findings based on current models

27  and modern understanding of the Bay.  *Id.*  Plaintiffs disagree with the weight afforded the 1955 Report, but they have not shown that the Navy's analysis was implausible or constituted

28  arbitrary or capricious action. *Motor Vehicle Mfrs.*, 463 U.S. at 43 (APA standard of review).

dismiss in 2008.  [# 61-2]  She describes the environmental review process, for example, that the 1999 EIS "built on and considered a 1995 EIS and some of its background documents."  Rosenberry Decl. ¶ 3.

The Navy moves to strike the declaration as evidence outside the record.

The Court grants the motion.  The declaration does not provide any information that is not otherwise available from the existing record.

### 6.  Court Requested Further Explanation from Navy

In the course of reviewing the papers, the Court requested clarification from the Navy on the impact of the steep slope near the shoreline and the deep sink on erosion.  [# 325]  The Court was concerned with the Plaintiffs' statement that dredging operations had moved a very deep sink significantly closer to their properties.  To comply with the Court's request, the Navy provided a declaration by Richard Stolpe, who was the lead analyst on erosion issues in the 2008 SEIS proceedings.[12]  [# 331]  As discussed below, Stolpe explained that Plaintiffs misread a document, which showed the facts do not support the Plaintiffs' interpretation of the data.  In those instances when the Court relied on the supplemental explanation, the Court cites Stolpe's Declaration.  *Camp*, 411 U.S. 142-43; *Pub. Power*, 674 F.2d at 793-94.

The Court notes that Stolpe cited evidence that was already part of the administrative record to illustrate his points, and that he did not submit new data.  The sole exception is the enlargement of the *legend* from the 1902 nautical map.  Ex. RCS-5 to Stolpe Decl.  The Navy correctly argues that the Court may consider the information on the legend to define the terms that are essential to reading the data on that map.  *Southwest Ctr.*, 100 F.3d at 1450.

---

[12]Stolpe holds a masters degree in geography with a concentration in coastal processes. Stolpe Decl. ¶ 1.  He worked for TEC, Inc. as a project manager, environmental planner, environmental analyst, and biologist, including the preparation of several environmental impact statements for the government. *Id.* ¶ 4.  In connection with the 2008 SEIS, Stolpe wrote the chapter on shoreline erosion, responded to the public's comments (including the Plaintiffs' submission of Skelly's report), and analyzed the historic maps used as background illustrations that show artificial fill on Coronado Island. *Id.* ¶¶ 8-9; *see* Def.'s Exs. Q & R.

In addition, the Navy submitted the entire text of Comment and Response 16, which is a part of the existing record.  [# 303]  The Plaintiffs' attorneys submitted that Comment during the 2008 SEIS period, and also attached Skelly's expert report.  The Navy responded to these concerns, which overlap the concerns expressed by Leo Beus, the representative of Plaintiff SLPR.  This submission was extremely helpful to the Court as it fleshed out the details of the Navy's analysis.  The Court cites this part of the Administrative Record as "Comment 16" or "Response 16" with the appropriate paragraph and page number.

**C. <u>Analysis</u>**

The Navy argues that it responded to Plaintiffs' concerns about shoreline erosion during the 2008 SEIS process.  The Navy evaluated new data and concluded that its dredging was not impacting the First Street shoreline.  The Navy argues that its conclusion is rationally related to the empirical evidence in the Administrative Record.  Having carefully reviewed the record, the Court agrees that the Navy "considered the relevant factors and articulated a rational connection between the facts found and the choice made." *Baltimore Gas*, 462 U.S. at 105.  The 2008 SEIS re-visited the erosion issue that had not been fully addressed in the 1999 EIS or 1995 EIS, and the Navy's belated analysis satisfies the APA standard of review.  Plaintiffs are not entitled to relief on their fourth cause of action against the Navy.[13]

**1. <u>Plaintiffs' Homes are Built on Artificial Fill</u>**

The Navy found that the area between First Street and the San Diego Bay had been artificially extended to create the land where Plaintiffs built their homes.  Plaintiffs criticize the Navy's reliance on aerial photographs because nautical charts and surveys provide more accurate data.  They demand detailed proof of the type of fill, dates, and locations.

---

[13]The Navy argued that the fourth claim is moot because the Court would not be able to grant effective relief since the Navy had already addressed all of Plaintiffs' concerns in the 2008 SEIS.  The Court rejects this argument.  Though the question itself is academic since the Navy prevailed on the merits, *if* the Court had ruled in the Plaintiffs' favor, it could have remanded the shoreline erosion issue back to the agency for further consideration. *Nat'l Audubon Soc'y v. Butler*, 160 F. Supp. 2d 1180, 1186-87 (W.D. Wash. 2001).

1    The Court concludes that the Navy's finding of fact is amply supported by the

2    record.  While it is true that aerial photographs provide a less precise measurement than a

3    survey, it is clear from the photographs that the bayside of First Street was extended with

4    artificial fill sometime after 1929, and again sometime after 1953.  Def.'s Ex. R, Fig. 12

5    (1928 photograph shows no room to develop bayside of First Street) (USA-321); *id.*, Fig.

6    14 (same, 1933 photograph) (USA-323); *see also* Pls.' Ex. Y (1999 EIS Geology, noting

7    artificial fill associated with development of Coronado Island) (USA-046928 & 046934).

8    The photographs show that there was simply not enough room to build a house between

9    First Street and the Bay *until* the area was created with artificial fill.

10    In any event, the Navy used historical photographs as one part of its evidence but it

11    also relied on the available nautical charts and surveys to make its finding.  Pls.' Ex KK at

12    K-143, ¶ 36-D (NAVFAC-002460); Def.'s Ex. R, Fig. 16 (USA-325), Fig. 18 (USA-327).

13    In sum, the record supports the finding that Plaintiffs' homes are built, to some

14    extent, on artificial fill.  Def.'s Ex. Q at 5-9, Figure 5.2-4 (USA-294); Def.'s Ex. R, Fig. 10

15    (1902 Nautical Map shows shoreline extends inland to interrupt First Street) (USA-319),

16    Fig. 11 (1912 map shows same interruption in First Street) (USA-320); Def.'s Ex. 20

17    (USA-060037) (shoreline in 1929 cuts through the current location of houses).

18    The Navy properly considered this factor in assessing the erosion problem.  As the

19    Navy points out, "[m]uch of the bay shoreline along Coronado and North Island is

20    composed of unconsolidated or loosely consolidated artificial fill material placed there

21    during the 1930s and 40s.  This artificial fill material is susceptible to deformation from

22    water and energy."  Def.'s Ex. R (USA-305).  The shoreline along First Street was exposed

23    to the mechanism of erosion (*e.g.*, currents) because private property owners had not built a

24    comprehensive, uniform barrier to protect the bluff.  *Id.*; *see also* Pls.' Ex. H at 35 ¶ 96

25    (USA-062738), 41-42 ¶ 113-114 (USA-062744-45).

26    In the same vein, Plaintiffs argue that the Navy's analysis is flawed because it fails

27    to recognize that the rate of erosion has increased in the last decade.  Plaintiffs contend that

28    ship wakes and the deep sink are causing the accelerated erosion.  Plaintiffs argue that the

1   Navy intermixed the concepts of the bluffline (located at a higher elevation) with the

2   shoreline (the mean high tide line).

3       The Court rejects Plaintiffs' argument because the Navy adequately explained its

4   analysis of the current geomorphology.  Def.'s Ex. Q at 5-2 (USA-289) & 5.5 (USA-300).

5   As noted, the Navy found that because the shoreline had been extended into the Bay with

6   artificial fill, the soil under Plaintiffs' property was more susceptible to erosion.  The Navy

7   further explained that First Street was not protected by an adequate erosion barrier.  *Id.* at

8   5-2; *see id.* at 5-3, n.4 (in 1955, ACOE advised homeowners to build a 1,900 foot

9   revetment with an elevation of 10 feet above MLLW to protect First Street).  Individual

10  homeowners provided a mix of isolated methods rather than coordinating a well-planned

11  erosion barrier.  *Id.* at 5-2 (USA-295).  Another factor was that the source of sediment into

12  the Bay from the San Diego River had been eliminated thus there is a "negative sediment

13  budget."  *See* Pls.' Ex. KK at K-146, ¶ 36-I (NAVFAC-002463).  The result of these

14  combined factors is that erosion occurs along First Street.

15      The Navy concluded that the rate of erosion had not accelerated over the last decade

16  but rather had maintained a constant rate.  Pls.' Ex. KK at K-142 (NAVFAC-002459).  It

17  only *appears* that erosion is happening more quickly because the Plaintiffs and their

18  neighbors have not built or maintained their own erosion barriers; artificial fill had been

19  replaced along the shore until 1987 but thereafter those efforts to replenish the fill ceased,

20  Def.'s Ex. Q (USA-299); and the San Diego River was not supplying sediment to the Bay

21  as compared to the past.  *See id.* (USA-293) (explaining that the shoreline that was created

22  with artificial fill "outward into San Diego Bay" was "not historically, bathymetically, or

23  geomorphologicaly supported by the natural state of the bay").

24      The explanatory declaration by Richard Stolpe further clarifies the Navy's point.

25  The maps show that the historic, natural state of the Bay has never "provided dry, hard

26  substrate land" where Plaintiffs built their homes.  Stolpe Decl. ¶ 18 (citing USA-049373).

27  Instead, the placement of fill extended the shoreline out into the Bay.  *E.g., id.* ¶ 13 (citing

28  USA-049373).  "There was artificial fill replenishment along First Street between 1929 and

1985." *Id.* ¶ 20.  There is no evidence that Plaintiffs replenished the artificial fill after

1985.  *Id.* (citing USA-050807).  The evidence showed that the "1985 shoreline was as

much as 90 feet bayward of its position in 1929."  Response 16-H (USA-050456).  "A

shoreline built of artificial fill, like the one at First Street, erodes relatively easily."  *Id.*  "It

is no coincidence that the shoreline has receded substantially since sand replenishment

efforts were ceased."  Response 16-W (USA-050463).

Plaintiffs argue that since the Navy knew that the artificial fill along the shoreline

was unstable, then it should have carefully examined the impact the dredging operations

would have on Plaintiffs' homes.  This argument is unpersuasive because the Navy

concluded that the shoreline was eroding from natural processes.  As discussed in the

sections below, the Navy examined the various factors that impacted the shoreline and

concluded that its dredging activities and military ship wakes did not significantly

contribute to an erosion process that would have naturally occurred over time.

### 2.  Steep Slope, Deep Sink, and Slope Stability

Plaintiffs argue that erosion is caused by the steep offshore slope that has moved

closer to their properties with each dredging project.  They contend that in 1902, the Bay

floor was 8-feet deep at a distance of 700 feet from their shoreline.  Pls.' Ex. KK at K-144

(NAVFAC-002461).  In contrast to this natural condition, by 2001, Plaintiffs contend the

water depths drop to 30 feet deep just 300 feet from their existing shoreline protection

structures.  *Id.* (citing Coronado Shoreline Report at 3); Pls.' Opp. Br. at 10 ("In lay terms,

if the hole is too steep, the land adjacent to the hole will begin to tumble in.").  Plaintiffs

argue this drastic change in the contour of the near-shoreline slope shows that it is not a

natural change, but one caused by dredging.  Yet, Plaintiffs argue, the Navy did not

consider the issue and did not study the stability of the slope.

This argument is based upon an error of fact.  Plaintiffs read the historical map to

refer to *feet*, when the actual abbreviation "f" referred to *fathom*.  *See* Ex. RCS-5 at p. 112

to Stolpe Decl. (enlarged copy of legend on the 1902 map at USA-050529).  A fathom is

six feet.  Thus, the 1902 map notation of 6 "f" indicates a depth of -36 feet MLLW.

Response 16-F (USA-050455).  The evidence does not support the Plaintiffs' claim that dredging dramatically changed the shoreline or that the navigation channel was, in its natural condition, a mere 9 feet deep.  *E.g.*, Comment 16-E (USA-050455).  Stolpe explains in his declaration that the older nautical charts measured depths of nearly 54 feet.  Stolpe Decl. ¶¶ 5, 12-13.  Further, the 1902 map shows that "the 8 foot indication is adjacent to a steep drop to 42 feet."  *Id.*

To the extent that the deep sink is now closer to the shore, the Navy addressed that fact.  The Navy's response to Plaintiffs' concern about the steep slope was two-fold.

First, because the San Diego River is no longer providing sediment to the Bay, "the run-up slope (i.e. the area where waves rush up) of sediment leading to the beach *gets steeper*."  Response 16-F (USA-050455); Pls.' Ex. KK at K-144 (NAVFAC-002461).  The Navy thoroughly discussed the Bay's "sediment budget."  *E.g.*, Pls.' Ex. Q (USA-063206 to 063208); Def.'s Ex. Q (USA-298 to 299) (sediment inputs and outputs); Response 16-C ("If sufficient sediment were available, there could be sediment accumulation along the shoreline.").

The Navy further explained that the area in the Bay called the Turning Basin has always been deeper relative to the shoreline.  The Turning Basin was a "natural depression" that was "geographically and historically . . . lower in relative bathymetry to the surrounding bay floor, except for the main channel."  Response 16-C (USA-050454).  Dredging did not alter that relationship.  "Because this area is deeper relative to the surrounding bathymetry, it functions in the same manner it historically has, as a confluence for sediments placed in suspension by other forces to reach the main navigation channel."

The Navy explained that the depth of the sink and the steep offshore gradient does not affect the "process and function" of shoreline erosion.  "The effect of gravity is substantially reduced in the denser underwater atmosphere."  Response 16-D (USA-050454). "The denser atmosphere also increases external pressure on the sediment grains" that are present in the Bay, which creates the "nearly vertical slope angles."  *Id.*  Because this analysis concerns a technical matter, the Court defers to the agency's analysis of the

evidence and the science.  *Nat'l Wildlife v. Nat'l Marine*, 422 F.3d at 798; *Nat'l Wildlife v. U.S. ACOE*, 384 F.3d at 1177-78.

Second, the Navy found that the "extension of land into deeper waters further increas[es] the slope of the sediment run-up area."  Pls.' Ex. KK at K-144 (NAVFAC-002461); Response 16-F (USA-050455); Response 16-J (USA-050456).  This "translates into significant reductions in horizontal movement of the waterline, which is what Mr. Skelly observed when he suggested that the mean lower low water actually moved landward [closer to mean higher high water] during the bayward build-out of the land."  Response 16-J (USA-050456).  The Navy concluded that "[t]his is what would be expected when the angle of run-up is steepened by reduction of sediment and build-out into deeper waters, vividly illustrating the problems created by unprotected build-out into a negative sediment environment."  *Id.*  The nautical maps with bathymetric readings confirm that during the years when artificial fill was added to the shoreline to extend the land into the Bay, the nearshore areas became more shallow.  Def.'s Ex. R (USA-305 & Figures 16 to 21).  However, after 1985, no artificial fill was added to the shoreline and the "bathymetry *appears* to deepen in the nearshore area."  *Id.* (emphasis added).

Stolpe's declaration illuminates the Navy's analysis, which the Court summarizes but does not repeat in full.  Stolpe Decl. ¶¶ 26-31.  The slope from the Coronado shoreline to the sink is stable and has not collapsed.  The dredging operation in 1999/2000 deepened the Turning Basin by 8 feet to -50 feet MLLW, "but there is no evidence that the modest change caused the basin to trap more sediment."  *Id.* ¶ 27.  Importantly, "[s]inks do not exert an attractive force; rather they are passive receivers of sediment that is suspended in water and then drops to the bottom."  *Id.*  As repeatedly noted, there is a "sediment deficit" in the San Diego Bay.  "The *depth* of the basin is not a direct factor in the *amount* of deposit."  *Id.* ¶ 29 (emphasis added).  "The sink functions [before and after the dredging] when currents flow *over* the sink and *sediment that was being carried drops into the sink.*"  *Id.*  Thus, regardless of dredging, the depth of the sink does not "cause" erosion at the shoreline where Plaintiffs live.

The Navy also responded to Skelly's bathymetric survey and his conclusion that a steep slope had moved closer to Plaintiffs' property.  Comment 16-D (USA-050454).  As noted above, Skelly's calculations were discredited because he read the map to refer to feet rather than fathoms.  Response 16-E & 16-F.  While there is a shallow area near the shore, it is next to an abrupt and steep dropoff.  Stolpe Decl. ¶ 13.  Once the true measurement is known, the Navy's analysis of the slope and its stability is rational and plausible.  *Motor Vehicle Mfrs.*, 463 U.S. at 43; *Humane Soc'y of the U.S. v. Locke*, 626 F.3d 1040, 1054 (9th Cir. 2010) (citation omitted) (APA requires only a "cogent explanation").  "The slope and depths are not as critical to the initiation of erosion as the loss of sediment input to the subject area."  Response 16-D.  The Navy concluded "it is not the slope but a force acting upon the sediment that initiates sediment movement."  *Id.*; Responses 16-K, 16-L, & 16-M.

### 3. **Ship Wakes**

Plaintiffs argue that the Navy ignored the ACOE's Coronado Shoreline Report.  *See supra* note 5.  That report stated that erosion along First Street could be related to wave action generated by boats that travel the Bay.

But the record shows that the Navy did consider the Coronado Shoreline Report.  Def.'s Ex. Q § 5.3 (USA-298-99).  The Navy did *not* study the impact of the wakes created by its large nuclear aircraft carriers, however, because its "carriers are not a source of ship wakes that would impact the shoreline."  Response 16-N (USA-050459).  There is a great deal of boat and ship traffic in the Bay, but the boats making those wakes are not aircraft carriers.  Response 16-O (USA-050459); *see also* Pls.' Ex. H at 4D (USA-062801) (1955 Report notes that passage of ships generate waves that reach First Street shoreline, but ACOE does not calculate number of Navy ships as opposed to commercial vessels or recreational boats).  "Aircraft carriers travel slowly through the bay and do not generate larger wakes, do not travel south of the turning basin near First Street, and are a very small portion of the total ship traffic in the bay."  *Id.*  The Navy carriers accounted for a mere 0.02% of total vessel movement in the San Diego Bay.  Def.'s Ex. Q (USA-299).  The Court discerns no error in this analysis.  To the extent that Plaintiffs' blame the Navy's

large nuclear aircraft carriers and their entourage for wave energy, their argument is not supported by the record.

In a related argument, Plaintiffs rely on the Court's Order on the Fifth Claim concerning dredging conducted for the Harbor Deepening Project in 2004. There, the Court held that the ACOE had overlooked the issue of ship wakes and remanded for further consideration. In that prior round of motions, the Federal Defendants had cited a 1995 computer model created by the Navy as evidence that the ACOE had considered but rejected a causal connection between dredging and erosion. The Court rejected the government's assertion that the 1995 computer model filled that gap because it did not study ship wakes, but only those caused by the tide. Order on the Fifth Claim at 14-15. The Court referred to Skelly's expert declaration because he identified the omission and explained its significance. *Id.* at 15-16. In the instant motion, Plaintiffs contend that the Navy is once again relying on this deficient 1995 computer model and that the 2008 SEIS suffers from the same flawed analysis.

This argument is not persuasive because the administrative records on the fourth and fifth claims are different. They were created by different agencies, at different times, and on different projects. In the instant motion, the Navy reopened its investigation of the impact of homeporting military ships on shoreline erosion in the 2008 SEIS proceeding. The Navy explained the reason it did not study ship wakes – its nuclear aircraft carriers do not travel past the Plaintiffs' homes – and the Court finds no clear error in that position. Consequently, the flaw in the 1995 computer model – the omission of ship wakes – does not determine the outcome of Plaintiffs' claim against the Navy in this motion. By contrast, as to the fifth claim, the ACOE had overlooked its own report – one prepared simultaneously with its environmental review on its 2004 dredging operations in cooperation with the Port District's plans for commercial vessels – that wakes from *all types of vessels* were eroding the shoreline along First Street. The Court remanded the issue to the ACOE for further consideration because the omission of ships wakes was fatal to the ACOE's analysis.

### 4. <u>Tugboats Do Not Cause Wakes</u>

The Navy uses tugboats to turn and move the nuclear carriers into dock.  The Navy concluded that "tug movements do not stir up sediment or create substantial wakes."  Def.'s Ex. Q at 5.15 (USA-300).

Plaintiffs attack this conclusion as inconsistent with other evidence.  Pls.' Ex. KK at K-145 to 146 (NAVFAC-002462 to 002463).  Plaintiffs note that the Navy has applied for a permit to repair its own quaywall due to damage caused, in part, by tug boats.  Pls.' Ex. T § 1.2 ("Scouring of these portions of the bay bottom may have resulted from propeller (prop) wash by tugs used to berth large [Navy] ships.") (USA-056119).

This purported evidence is very weak considering that the quaywall was built in 1944, and was last repaired in the late 1980s.  *Id.*  Plaintiffs' argument also fails because the Navy concludes that the damage at the base of its quaywall at the extreme depth of -60 feet MLLW proves, rather than disproves, that tugboat energy is focused downward.  The Navy relied on the fact that the tug boats' propellers are pointed downward.  Def.'s Ex. Q at 5.15 (USA-300).  In addition, the Navy noted that the tug boats are operated in the Turning Basin, and that deep area of the Bay contains energy within it.  Pls.' Ex. KK at K-146, ¶ 36-H (NAVFAC-002463).  Thus, the Navy's conclusion that tugboats do not create substantial wakes that would cause erosion near Plaintiffs' homes is supported by the record and is not arbitrary or capricious.  *Baltimore Gas*, 462 U.S. at 105; *Lands Council*, 537 F.3d at 988, 993-94, 999-1000.

### 5. <u>Bathymetric Profile and Violation of Permit</u>

Plaintiffs argue the Navy did not study the actual depth of the entire dredged area by preparing a bathymetric profile.  They contend the record does not contain a bathymetric survey of the contours of the completed dredging projects or the depths reached after the dredging activities at issue in this litigation.  Plaintiffs argue that had the Navy performed a bathymetric profile, it would have shown the correlation between dredging and erosion.

The Navy refutes this contention by pointing to the 2007 survey (reproduced as Plaintiffs' Exhibit G) which was conducted *after* the Navy's dredging operations.  That

study, entitled "Naval Air Station North Island (NASNI), *Bathymetry* and Vegetation Survey," was prepared for the Naval Facilities Engineering Command by an outside company, Tierra Data Inc.  Pls.' Ex. G (USA-062130 to 062138) (emphasis added); *Lands Council*, 537 F.3d at 993, 999 (use of independent experts).  The survey "footprint" included the Turning Basin and berth areas.  Pls.' Ex. G ¶ 2.0.  The Navy had a strong interest in accurate results because if sediments had accumulated the change "would be potentially harmful to vessels arriving and departing wharfing facilities."  *Id.* ¶ 1.0.  The report describes how the surveys were conducted, how the bathymetric maps were created, and the results.  *Id.* ¶¶ 2.0-4.0 & Figures 2-4.

Plaintiffs complain that the survey is inadequate because it does not explain the source of the unevenness on the Bay floor.  Plaintiffs speculate that the uneven depth is caused by the settlement of erosion sediments from their properties.  The Court accepts the Navy's reasonable explanation that the floor of the ocean is naturally uneven.  *Overton Park*, 401 U.S. at 415-16; Def.'s Reply Br. at 17.  The Court sees no reason to question the common sense conclusion that dredging creates uneven terrain with mounds and valleys.  *See* Defs.' Ex. 17 (describing two methods of dredging as hydraulic with suctions and hoppers and mechanical with clamshell scoop).  Moreover, there is no indication the methodology was unreliable.  *Earth Island*, 626 F.3d 462; *Lands Council*, 537 F.3d at 988, 994, & 1000 (it is within the Navy's discretion to choose its methodology and rely on its chosen studies, so long as it explains why it is reliable).  When a court applies the APA deferential standard of review, it does not "stray beyond the judicial province . . . to impose upon the agency its own notion of which procedures are 'best.'"  *Vermont Yankee Nuclear Power Corp. v. NRDC, Inc.*, 435 U.S. 519, 549 (1978).

Plaintiffs further complain the Navy did not *compare* the 2007 results with a bathymetric map of the pre-dredged Bay.  Plaintiffs offer no support for their assertion that the Navy was required to do so.  The ACOE Permit simply required a post-dredging survey to highlight areas of *over*dredging.  Pls.' Ex. V at 11 ¶ 6 (USA-008630).  The Navy hired an outside company and that study confirmed that the depths were within the allowable

1    range.

2        In a closely related argument, Plaintiffs suggest that the Navy violated its permit by

3    dredging too deep.  Pls.' Mot. Br. at 13-14.  The permits authorized dredging to a

4    maximum depth of -55 MLLW (with a three-foot leeway for overdredging).  Pls.' Exs. P &

5    V.  Plaintiffs point to numbers in the record that suggest the dredging went to 60 or even 70

6    feet.  Pls.'s Ex. G.  Plaintiffs complain that the true facts are unknown because the Navy

7    failed to conduct a comprehensive bathymetric study of the contours of the entire Bay.

8        The evidence that Plaintiffs cite does not support their contention.  The documents

9    state that the "dredging was performed to *approximately* 60 ft mean lower low water."

10   Pls.' Ex. G (USA-062131) (emphasis added).  The orange line on the graph shows the

11   bottom at within the depth authorized by the permit and any unevenness is to be expected

12   with dredging variations, scouring, and mounding.  Def.'s Reply Br. at 17.  Further, the

13   Court agrees with the Navy that the context of the SPAWAR report shows that it

14   "assumed" alternate depths of 50, 60, and 70 *for purposes of the study*.  Pls.' Ex. Q (USA-

15   063209).  The study assumed three different depths for the purpose of conducting a

16   hydrographic model as a part of the analysis.  The Navy explained that those numbers were

17   used as part of the model but do not represent actual dredging depths.  When the Navy

18   conducted sonar soundings, it recorded depths to 55.25 feet.  Pls.' Ex. G § 3.0 (USA-

19   0621134).  Thus, there is no evidence that the Navy violated its permits.

20       **6.  Currents and Sediment Transport Near Plaintiffs' Property**

21       Plaintiffs contend that the Navy intentionally avoided a study of the specific site

22   where Plaintiffs' homes are located.  They contend the Navy conducted general and global

23   studies that failed to consider the uniqueness of the First Street shoreline.  For example,

24   they contend the erosion occurs at unequal rates and that it is more dramatic at the

25   properties closest to the Turning Basin.

26       The Court concludes that the Navy's analysis of this issue was not arbitrary or

27   capricious.  *City of Sausalito*, 386 F.3d at 1205-06; Pls.' Ex. Q (USA-063208 to 063209)

28

(2008 SEIS analyzes currents as studied by SPAWAR).[14]  The Court will not micro-manage the scientific studies; the Navy is entitled to rely on its own experts.  *Lands Council*, 537 F.3d at 988; *Nat'l Wildlife v. U.S. ACOE*, 384 F.3d at 1177-78.  Here, the Navy contracted with an independent company to conduct a study of the currents and sediment transport.  Def.'s Ex. S (USA-332 to 352).  SPAWAR studied the near shore currents along First Street.  *Id.* & Fig. 2 (USA-334 to 335) (circling the area of interest just south of NASNI).  The purpose of the study was "to examine whether the deepening of the Turning Basin had any effect on those currents."  *Id.*  This refers to the largest dredging operation, as approved by the 1995 EIS, which increased the depth from -42 MLLW to -50 MLLW.  SPAWAR used a hydrodynamic model to predict the currents at both of those depths.  *Id.*  SPAWAR used an "acoustic Doppler current meter" to collect measurements at three locations.  *Id.* (USA-337).  The current speed and direction was studied during incoming and outgoing tide.  SPAWAR analyzed the data it collected, considered sediment transport, and reviewed past studies.  *E.g., id.* (USA-343 to 344).  SPAWAR concluded that "post-dredge currents are not faster than pre-dredge currents taken in the vicinity."  *Id.* & Fig. 14 (USA-345 to 346).  The study also employed a "two-dimensional hydrodynamic model."  *Id.* (USA-346 to 347).  Using the data collected over 12 days, the study found "very little apparent change in current speeds."  *Id.* (USA-350).  In sum, SPAWAR concluded that "[d]eepening the basin would in fact reduce current speed in the vicinity" of the Coronado shoreline. *Id.* (USA-352); Pls.' Ex. Q (USA-063209).

The Navy relied on the SPAWAR study as well as other data to evaluate the currents along First Street and whether dredging had any impact.  Pls.' Ex. Q (USA-063208 to 063209).  The Navy stated:

> This [First Street] area is not appreciably affected by dredging of the turning basin because currents in the bay are governed by the physical constraints of the entire bay (shape, size, and bathymetry) and oceanic inputs and outputs. Moreover, the conservation laws of mass and momentum establish that confined dredging of the turning basin would decelerate currents in the turning basin.  The result therefore would be slightly *reduced* current velocity along the northern shore of First Street.  *The currents were shown to be too*

[14]Defendant inadvertently omitted these two pages from its own Exhibit Q.

*weak to move sediments along the shore.* Therefore, dredging in the turning basin does not promote transport of sediments away from First Street in bay currents.

*Id.* (USA-603209) (emphasis added).

Given the highly technical subject matter, the Court defers to the Navy's selection of the means to study the issue and its assessment of the significance of the independent expert report. *Earth Island*, 626 F.3d 462; *Lands Council*, 537 F.3d at 988, 993-94, & 1000. The Court's role is not to second-guess the chosen parameters or sampling method. *Lands Council*, 537 F.3d at 988, 993-94, 1000. In its expertise, the Navy has deemed the SPAWAR study appropriate and reliable and has explained that the data shows no increase in erosion after the homeporting projects. *Id.* That Plaintiffs would have conducted a different study does not meet their burden of showing the Navy made a "clear error of judgment." *Id.*

### 7. Presence of Eelgrass Along the Shoreline

The Navy relied on the presence of a large bed of eelgrass near the dredging project to conclude that dredging was not causing shoreline erosion. The Navy determined that the presence of eelgrass proves the submerged lands are stable because "it will not grow if the sediment is highly active or the bay floor experiences frequent changes." Def.'s Ex. Q (USA-296). If eelgrass is physically disturbed by erosion or prop wash, it will disappear or be limited to small pockets. *Id.*

Plaintiffs argue the Navy ignored available evidence that contradicted that conclusion. They cite a Navy-supervised study dated August 27, 2004 that showed a reduction in eelgrass coverage from a 1999 survey to the date of the 2004 study. Pls.' Ex. K (USA-22542). They also cite the follow-up survey, conducted on March 8, 2005, to determine if the dredging of the Central Navigation Channel had affected the coverage and density of the eelgrass. Pls.' Ex. L (USA-21846 to 21848). One area showed a 1.3% decrease in coverage but three other areas increased 6.3%, 8.2%, and 25%, resulting in an overall increase. The scientist noted that the area that decreased was the farthest from the dredge footprint and the area did not have much space for the eelgrass to expand. *Id.* (USA-21848).

1   Plaintiffs describe the data as showing a "drastic reduction" in eelgrass coverage,

2   but the cited documents do not support that claim.  By contrast, the Navy describes the

3   eelgrass as "vibrant."  Def.'s Reply Br. at 16; Def.'s Ex. 19 (USA-063835 to 063838)

4   (maps show increase of eelgrass *after* the Navy dredged the Turning Basin and Navigation

5   Channel in 1998, which was the most extensive dredging project, and *after* the Navy

6   dredged the berthing area at Pier J/K in 2002).  Putting these adjectives aside, the record

7   plainly shows that the Navy considered this factor, relied on scientific surveys showing the

8   presence of eelgrass (approximately 2,800 linear feet of it near First Street), and made a

9   rational conclusion that the eelgrass growing in the area showed the dredging was not

10  adversely impacting the shore.[15]  Def.'s Ex. Q (USA-296 to 297) (Fig. 5.25).  To the extent

11  that the record contains contradictory evidence on the exact quantity of eelgrass, the agency

12  is entitled to rely on its own technical experts.  *Nat'l Wildlife v. Nat'l Marine*, 422 F.3d at

13  798; *Nat'l Wildlife v. U.S. ACOE*, 384 F.3d at 1177-78 (when technical question is complex

14  and qualified scientists disagree, court must give "substantial deference" to agency's

15  judgment) (citing *Baltimore Gas*, 462 U.S. at 103).  Overall, the Navy found a "net

16  increase" in eelgrass beds.  Pls.' Ex. KK at K-148.  The APA standard has been satisfied.

17  *Baltimore Gas*, 462 U.S. at 105; *City of Sausalito*, 386 F.3d at 1205-06.

18  **IV.    CZMA**

19  Plaintiffs also argue that the Navy violated the CZMA by withholding the ACOE's

20  1955 report that indicated dredging operations had caused erosion along First Street.  The

21  Navy deprived the California Coastal Commission of the opportunity to address known

22  erosion and whether to impose feasible mitigation measures.

23  The Court finds that the elimination of an old report from 1955 would not have

24  changed the analysis of erosion.  *See supra* n.11; *cf. City of Sausalito*, 386 F.3d at 1221-23.

25  **V.    National Environmental Policy Act ("NEPA")**

26  Plaintiffs argue that the Navy violated NEPA by failing to take a "hard look" at the

27

28      [15]The Court denies the Navy's request to consider two undated photographs that were not part of the administrative record.  Def.'s Exs. 10 & 11; *see Southwest Ctr.*, 100 F.3d at 1450-51.

significant environmental impacts of the dredging projects.  TAC ¶ 101; 42 U.S.C. § 4332; *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n.21 (1976).  In particular, Plaintiffs argue the Navy failed to consider the cumulative impact of the past dredging projects going back to World War II.  *Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 809 (9th Cir. 1999).

"NEPA itself does not mandate particular results, but simply prescribes the necessary process."  *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989).  NEPA ensures that "the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts; it also guarantees that the relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision."  *Id.* at 349.  The Court applies the APA standard of review.  *Kleppe*, 427 U.S. at 410 n.21; *Hapner v. Tidwell*, 621 F.3d 1239, 1244 (9th Cir. 2010); *Northwest Envtl. Advocates v. Nat'l Marine Fisheries*, 460 F.3d 1125, 1139 (9th Cir. 2006); *Morongo Band of Mission Indians v. F.A.A.*, 161 F.3d 569, 573 (9th Cir. 1998).

Plaintiffs have not shown that the Navy ignored evidence; rather, Plaintiffs disagree with the depth of the analysis performed and the conclusions reached.  *Earth Island Institute v. Carlton*, 626 F.3d 462 (9th Cir. 2010).  The Court's role is not to substitute a theoretically perfect analysis, but instead to ensure that the agency's conclusion is supported by the relevant facts and rationally connected to those facts.  *Kleppe*, 427 U.S. at 410 n.21 ("Neither the statute nor its legislative history contemplates that a court should substitute its judgment for that of the agency as to the environmental consequences of its actions."); *Northwest Envtl.*, 460 F.3d at 1139 ("NEPA requires not that an agency engage in the most exhaustive environmental analysis theoretically possible, but that it take a 'hard look' at relevant factors.").  Here, the Navy specifically considered the evidence and opinions of Plaintiffs' expert, Mr. Skelly, as advanced by Plaintiffs' prior attorneys.  Pls.' Ex. KK; Comment 16.  The Navy also hired independent consultants to perform technical studies.  *E.g.*, Def.'s Ex. S.  The Court defers to "the informed discretion of the responsible

federal agencies" who analyzed the technical information concerning shoreline erosion. *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 375-78 (1989); *Humane Society*, 626 F.3d at 1058-59; *Morongo Band*, 161 F.3d at 577 (courts reject attempts to engage in battles of experts because agency has discretion to rely on reasonable opinions of its qualified experts, even when a contrary expert offers a persuasive view).

The Court also finds that the Navy's cumulative impact analysis was not arbitrary or capricious. The record shows that the Navy sufficiently considered historical evidence, for example, the 1955 ACOE report on shoreline erosion along Coronado (which discussed surveys conducted in 1944 and 1954); the natural condition of the shoreline (including maps as early as 1782); and bathymetry data from 1948 through 2000 (including the extent of artificial fill along the shoreline and the deep water basin, known as the Spanish Bight, that historically separated Coronado Island at the boundary of the NASNI). Because the 2008 SEIS concluded, as did the earlier 1995 EIS and 1999 EIS, that homeporting the deep-draft nuclear carriers would "have virtually no effect" on shoreline erosion, "detailed cataloguing of past projects' impact" was "unnecessary." *Northwest Envtl.*, 460 F.3d at 1140.[16]

**<u>Conclusion</u>**

Upon due consideration of the parties' memoranda and exhibits, a thorough review of the record, and for the reasons set forth above, the Court **GRANTS** Navy's summary judgment motion [# 251], and **DENIES** Plaintiffs' cross motion [ # 287] on the fourth cause of action. The Court **GRANTS IN PART AND DENIES IN PART** the Navy's motion to strike certain extra-record documents. [# 296]

/ / /

---

[16]Plaintiffs do not raise the second goal of public participation.
Plaintiffs make a similar argument about cumulative impacts in their APA claim. The Court does not repeat the analysis. *See* Pls.' Exs. EE, FF, & HH.

As this Order resolves the final cause of action in the Third Amended Complaint, *see supra* note 1, the Clerk shall terminate this civil action.

**IT IS SO ORDERED.**

DATED:  May 2, 2011

Hon. Michael M. Anello
United States District Judge

06CV1327